**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lisa Doyle, | No. CV 09-02062-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Lisa Doyle ("Plaintiff") seeks judicial review and reversal of the final decision of the Commissioner of Social Security to deny Plaintiff's claim for disability insurance benefits pursuant to 42 U.S.C. § 405(g). After consideration of the arguments set forth in the parties' briefs, the record in the case, and the applicable law, the Court issues the following order.

**I. Procedural History**

On January 18, 2007, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, alleging disability beginning January 1, 2005. (Administrative Record ("AR") 183). Plaintiff's application was denied initially and on reconsideration. (AR 103, 125). Plaintiff requested a hearing on January 22, 2008. (AR 133). A hearing was held on August 11, 2008. (AR 27-64). The ALJ denied Plaintiff's application for a period of disability and

disability insurance benefits on October 1, 2008. (AR 103-112). Plaintiff requested review of the ALJ's decision. (AR 138-41).

The Appeals Council granted Plaintiff's request for review, vacating the ALJ's decision and remanding Plaintiff's claim to the ALJ for further administrative proceedings. (AR 113-16). A new hearing was held on May 18, 2009, at which Plaintiff and her attorney were present. (AR 65). On June 4, 2009, the ALJ issued a decision that Plaintiff was not disabled. (AR 13-26). The Appeals Council denied Plaintiff's request for review. (AR 1-5). Plaintiff filed a complaint with this Court on September 30, 2009, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g). (Doc. 1).

## II.     Brief Background

Plaintiff was forty-five years old as of the date she alleged she became disabled. (AR 83). Plaintiff was forty-nine years old in June 2009 when the ALJ issued his second decision. (AR 191). Plaintiff completed four or more years of college and has past relevant work experience as a nurse and furniture restorer. (AR 93-94, 218, 223).

## III.    Medical History

Plaintiff alleges disability beginning January 1, 2005. (AR 191). Plaintiff was hospitalized on her disability onset date with complaints of chest pain. (AR 280). Doctors performed an echocardiogram, which was essentially normal. (AR 270-71). A chest x-ray was negative. (AR 272, 274). Plaintiff underwent cardiac catherization and stent placement, and doctors started Plaintiff on medications. (AR 280). Plaintiff was diagnosed with coronary artery disease, status post-stent placement; hypertension;[1] tobacco use; and chronic obstructive pulmonary disease ("COPD").[2] (AR 280).

---

[1] Hypertension refers to abnormally high arterial blood pressure. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/hypertension (last visited Dec. 3, 2010).

[2] COPD causes a limitation of airflow to and from the lungs resulting in shortness of breath. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/chronic%20obstructive%20pulmonary%20disease (last visited Dec. 3, 2010).

In January 2005, Plaintiff was again hospitalized with complaints of chest pain. (AR 277). Doctors determined that Plaintiff had a regular heart rate and rhythm, and that her lungs were essentially clear to auscultation and percussion without intercostal retraction. (AR 278). A cardiac monitor revealed that Plaintiff had a normal sinus rhythm and no other acute changes or arrhythmia. (AR 277-79). A January 10, 2005 chest x-ray showed normal heart size, clear lungs, no pneumothorax,[3] and slight elevation of the left hemidiaphragm.[4] (AR. 272).

In January 2005, Plaintiff reported to Dr. Urich, a treating physician, that she still had occasional chest pain and shortness of breath, and that nitroglycerin helped relieve the pain. (AR 292). Plaintiff told Dr. Urich that her symptoms occurred when she was upset. (AR 292). Dr. Urich found that she had clear lungs, normal blood pressure, regular heart rate and rhythm, and no extremity cyanosis,[5] clubbing,[6] or edema.[7] (AR 292-93). Dr. Urich diagnosed status-post myocardial infarction, anxiety, and tobacco abuse. (AR 292). Dr. Urich recommended that Plaintiff limit her activity as much as she could tolerate. (AR 293). Dr. Urich stated in his report, that according to Plaintiff's boyfriend, Plaintiff was doing a

---

[3] Pneumothorax is a collection of air or gas located in a cavity between the lungs and chest wall. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/Pneumothorax (last visited Dec. 3, 2010).

[4] A hemidiaphragm is half of the diaphragm, which serves as the main muscle for respiration. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/hemidiaphragm (last visited Dec. 3, 2010).

[5] Cyanosis causes skin and mucous membranes to turn blue due to insufficient oxygen in the blood. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/Cyanosis (last visited Dec. 3, 2010).

[6] Clubbing is the widening and rounding of the tips of a person's toes and fingers caused by a lack of oxygen in the blood. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/clubbing (last visited Dec. 3, 2010).

[7] Edema is the swelling of tissues as a result of excess water buildup. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/Edema (last visited Dec. 3, 2010).

1  lot of house and yard work. (AR 293). Dr. Urich also recommended smoking cessation.
2  (AR 293).

3       In June 2005, Plaintiff visited Dr. Pierrend, a treating physician, for medication refills.
4  (AR 289). Dr. Pierrend reported a history of coronary artery disease, as well as a history of
5  tobacco and alcohol abuse. (AR 289). Plaintiff reported that she still smoked cigarettes but
6  was trying to cut down. (AR 290). Dr. Pierrend found that she had clear lungs and a regular
7  heart rate and rhythm. (AR 290). Dr. Pierrend stated that Plaintiff had no clubbing,
8  cyanosis, or edema in any of her extremities. (AR 291). Dr. Pierrend diagnosed coronary
9  artery disease, status post myocardial infarction; left lower extremity cellulitis; hypertension;
10 anxiety; and tobacco abuse. (AR 291).

11      In August 17 2005, Plaintiff visited Dr. Sandoval, a treating physician, for a follow-up
12 appointment. (AR 266-68). Plaintiff reported that she continued to smoke one pack of
13 cigarettes per day. (AR 266). Dr. Sandoval found that Plaintiff had relatively clear, though
14 diminished lungs, and that she had a regular heart rate and rhythm. (AR 267). Plaintiff had
15 no peripheral edema, and an electrocardiogram revealed normal sinus rhythm. (AR 267).

16      Dr. Sandoval diagnosed atherosclerotic heart disease status-post myocardial
17 infarction, suboptimally controlled hypertension, tobacco abuse, COPD secondary to tobacco
18 abuse, and emotional lability. (AR 267). Dr. Sandoval reported that Plaintiff had no
19 objective signs of coronary insufficiency. (AR 267). He recommended an exercise stress
20 test. (AR 267). As Plaintiff was leaving Dr. Sandoval's office, she requested a letter stating
21 that she was disabled. (AR 268). Dr. Sandoval did not issue the letter and stated in his report
22 that he "did not feel there was any objective information that made her medically disabled,
23 at least from a cardiac standpoint." (AR. 268).

24      In October 2006, Plaintiff was admitted to the hospital for left lower lobe pulmonary
25 embolism[8] with some intermittent chest pain. (AR 345). Dr. Sellberg, a treating physician,

---

[8] A pulmonary embolism occurs when a piece of a blood clot from deep vein thrombosis breaks off and becomes lodged in one of the branches of the pulmonary artery of the lung. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/pulmonary%20embolism

- 4 -

1   examined Plaintiff and noted that while Plaintiff denied illicit drug use, she tested positive
2   for amphetamines in January 2005. (AR 346).

3   In November 2006, Plaintiff again saw Dr. Sellberg for a follow-up appointment. (AR
4   308-11). Plaintiff told Dr. Sellberg that she was experiencing chest discomfort. (AR 309).
5   Plaintiff reported that she smoked one pack of cigarettes per day. (AR 308). Plaintiff also
6   reported that she exercised four times per week. (AR 309). Dr. Sellberg found that she had
7   clear lungs, normal heart rate and rhythm, and no extremity clubbing, cyanosis, or edema.
8   (AR 310). She diagnosed pulmonary embolus, hypertension, hyperlipidemia,[9] and coronary
9   heart disease. (AR 310).

10  On December 5, 2006, Plaintiff again saw Dr. Sellberg for a follow-up appointment.
11  (AR 449). Plaintiff reported that she used methamphetamine three to four times per week.
12  (AR 449). She also reported that she continued to smoke cigarettes. (AR 449). Dr. Sellberg
13  found that she had clear lungs, normal heart rate and rhythm, and a 2+ edema in her bilateral
14  lower extremities. (AR 450). Dr. Sellberg diagnosed pulmonary embolus, hypertension,
15  hyperlipidemia, and coronary heart disease. (AR 450). Dr. Sellberg recommended tobacco
16  and methamphetamine cessation. (AR 450).

17  On December 17, 2006, Plaintiff was admitted to the hospital with complaints of
18  hematuria[10] and back pain. (AR 417). Plaintiff's urine drug screen tested positive for
19  amphetamines, cocaine, and opiates. (AR 415).

20  On December 22, 2006, Dr. Patel, a treating physician, examined Plaintiff. (AR 411).
21  Dr. Patel reported that Plaintiff was stable from a cardiac standpoint. (AR 411). Dr. Patel
22  recommended that Plaintiff discontinue using Plavix because Plaintiff had her stent
23  placement almost two years ago, and it was no longer necessary to continue with the

---

(last visited Dec. 3, 2010).

[9]Hyperlipidemia is the excess of fats or lipids in the blood. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/Hyperlipidemia (last visited Dec. 3, 2010).

[10]Hematuria is the presence of red blood cells in the urine. Medical Dictionary: MedlinePlus, http://www.merriam-webster.com/medlineplus/Hematuria (last visited Dec. 3, 2010).

- 5 -

1 medication. (AR 410-11). A pulmonary function test conducted that same day revealed that Plaintiff had a DLCO of 52 percent of the predicted value.[11]

On December 26, 2006, Dr. Orr, a treating physician, examined Plaintiff. (AR 524). Dr. Orr diagnosed pulmonary embolism, coronary artery disease, status post myocardial infarction, tobacco abuse, history of alcohol abuse, history of drug use, dyspnea,[12] and obstructive lung disease. (AR 524). Plaintiff tested positive for amphetamines, cocaine, and opiates. (AR 525).

In January 2007, Plaintiff visited Dr. Pierrend. (AR 286). Dr. Pierrend found that Plaintiff had a regular heart rate and rhythm. (AR 287). Dr. Pierrend diagnosed obstructive lung disease, hypertension with suboptimal control, pulmonary embolism three months previously, resolved hematuria, history of coronary disease, and tobacco abuse. (AR 287). Dr. Pierrend explained that, based on her oximetry results, Plaintiff did not qualify for home oxygen. (AR 288).

In February 2007, Dr. Sellberg found that Plaintiff's lungs were clear to auscultation and that she had a normal heart rate and rhythm. (AR 301). Dr. Sellberg further found that Plaintiff had a 1+ edema in her bilateral lower extremities. (AR 301). In addition, Dr. Sellberg diagnosed coronary heart disease, hyperlipidemia, hypertension, and pulmonary embolus. (AR 301). Dr. Sellberg continued Plaintiff's medications and recommended smoking cessation. (AR 301).

In May 2007, Dr. Lugoff, an examining state-agency physician, reviewed the medical evidence and found that Plaintiff could occasionally lift twenty pounds and that she could frequently lift ten pounds. (AR 314). Dr. Lufogg also found that in an eight-hour workday,

---

[11] A DLCO report measures a patient's diffusing capacity of the lungs for carbon monoxide. Medical Dictionary: MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003854.htm (last visited Dec. 3, 2010).

[12] Dyspnea is the medical term for shortness of breath. Medical Dictionary: MedlinePlus, http://vsearch.nlm.nih.gov/vivisimo/cgi-bin/query-meta?v%3Aproject=medlineplus&query=Dyspnea+&x=23&y=16 (last visited Dec. 3, 2010).

- 6 -

1  Plaintiff could stand or walk for two hours and that she could sit for six hours. (AR 314).
2  Dr. Lugoff reported that Plaintiff could occasionally climb stairs, kneel, stoop, crouch, and
3  crawl. (AR 315).

4  In October 2007, Dr. Mirzaei, an examining state-agency physician, evaluated
5  Plaintiff's ability to do work-related activites. (AR 325). Dr. Mirzaei found that Plaintiff
6  had no difficulty ambulating or keeping her balance. (AR 326). Dr. Mirzaei further stated
7  in his report that Plaintiff could walk on her toes and heels and could squat halfway with no
8  difficulty. (AR 326). Dr. Mirzaei opined that although Plaintiff was not capable of
9  performing any kind of strenuous activity, Plaintiff was capable of mild to moderate activity.
10 (AR 328). Dr. Mirzaei found that Plaintiff could stand and walk six hours in an eight-hour
11 workday, given frequent and routine breaks. (AR 328). Dr. Mirzaei further found that
12 Plaintiff could sit with no obvious limitations. (AR 328). Dr. Mirzaei stated that Plaintiff
13 was able to lift and carry twenty pounds frequently and forty pounds occasionally. (AR 328).
14 Plaintiff could not, however, work around temperature extremes, fumes, gases, chemicals,
15 dust, or pollen. (AR 328). Additionally, Plaintiff could not work around moving machinery
16 and heights. (AR. 328).

17 On November 13, 2007, Plaintiff underwent a pulmonary function test where
18 according to Dr. Chaffee, Plaintiff gave inadequate effort. (AR 321). Additional testing was
19 unsuccessful, and post-testing was not performed due to normal findings. (AR 321).

20 On November 19, 2007, Dr. Radkowsky, an examining state-agency physician,
21 reviewed the medical evidence and found that Plaintiff could frequently climb stairs, balance,
22 stoop, kneel, crouch, and crawl. (AR 331). Dr. Radkowsky found that Plaintiff was not
23 capable of climbing ladders, scaffolds, or rope. (AR 331). Dr. Radkowsky further found that
24 if given normal breaks, Plaintiff could stand or walk for a total of six hours in an eight-hour
25 workday and that Plaintiff could sit for a total of six hours. (AR 330).

26 In February 2008, Plaintiff visited Dr. Orr. (AR 391). Plaintiff reported to Dr. Orr
27 that she had a history of methamphetamine and cocaine use. (AR 382). Dr. Orr found that
28 Plaintiff had occasional scattered rhonchi, regular heart rate and rhythm, and no extremity

1  swelling. (AR 383). Dr. Orr diagnosed dyspnea, coronary artery disease, sleep disturbance,
2  pulmonary embolism, tobacco abuse, drug abuse, and depression. (AR 382). Dr. Orr
3  recommended a pulmonary function test, an echocardiogram, a sleep study, and a six-minute
4  walk. (AR 383). Dr. Orr opined that Plaintiff was "not gainfully employable." (AR 383).
5  That same day, Plaintiff underwent the six-minute walk test where she achieved a heart rate
6  of 139 and walked 1,200 feet without stopping. (AR. 379).

7  In July 2008, Plaintiff again visited Dr. Orr. (AR 380). Dr. Orr found that in an eight-
8  hour workday, Plaintiff was capable of continuously sitting for two hours and that Plaintiff
9  was capable of continuously standing or walking for one hour without sitting. (AR 355). Dr.
10 Orr further stated that, in an eight-hour workday, Plaintiff could sit for a combined total of
11 four hours and could stand or walk for a combined total of two hours. (AR 355). Dr. Orr
12 stated that Plaintiff could occasionally lift up to twenty pounds and could frequently lift up
13 to five pounds. (AR 355). Plaintiff could use her hands for simple grasping and fine
14 manipulation but not for pushing or pulling of controls. (AR 356). Plaintiff could not squat,
15 crawl, or reach, but could occasionally bend and climb. (AR 356). Dr. Orr opined that
16 Plaintiff had moderate restrictions on being around moving machinery, driving an
17 automobile, and exposure to dust, fumes, and gases. (AR 356). Dr. Orr opined that Plaintiff
18 experienced "moderately severe" pain and fatigue. (AR. 357). On August 29, 2008, Dr. Orr
19 stated that Plaintiff "has multiple medical problems that have rendered her incapable of
20 maintaining gainful employment." (AR 403).

21 In December 2008, Plaintiff complained to Dr. Sellberg of episodes where she felt her
22 heart was stopping. (AR 611). Plaintiff reported that she treated these episodes with
23 methamphetamine. (AR 611). Dr. Sellberg found that she had clear lungs and a normal heart
24 rate and rhythm. (AR 612). Dr. Sellberg diagnosed coronary heart disease, pulmonary
25 embolus, hypertension, and hyperlipidemia. (AR 613). Dr. Sellberg continued Plaintiff's
26 medications and recommended an exercise Myoview stress test. (AR 613). The result of the
27 Myoview stress test showed that Plaintiff had a normal ST segment response to the test. (AR
28 609). Plaintiff had no exercise-induced chest pain. (AR 609). According to Dr. Sellberg,

1  the results were consistent with an intermediate risk of adverse coronary event during the
2  following one to two years. (AR. 609).

3  In May 2009, Dr. Bria, a treating physician, completed an evaluation of Plaintiff's
4  ability to do work-related activities. (AR 617). Dr. Bria stated that in an eight-hour
5  workday, Plaintiff could sit for a total of one hour, and Plaintiff could stand or walk for a
6  total of one hour. (AR 617). Dr. Bria further stated that Plaintiff could not squat or climb
7  but that Plaintiff could occasionally bend, crawl, and reach. (AR 618). Dr. Bria found that
8  Plaintiff could not be exposed to dust, fumes, and gases. (AR 618). Dr. Bria opined that
9  Plaintiff's pain and fatigue were moderately severe. (AR 619).

## IV. Medical Expert Testimony

At the second hearing in May 2009, Dr. Wiseman, a medical expert, testified that his review of the record showed Plaintiff had a myocardial infarction for which she underwent a successful angioplasty procedure with no ongoing arrhythmia or heart failure. (AR 65, 70). Dr. Wiseman stated that the measurements of Plaintiff's pulmonary function using spirometry showed results well above the values that would be considered disabling. (AR 72). Dr. Wiseman further stated that the records showed Plaintiff was physically active and capable of doing physical exercise from the alleged onset date of disability to December 2006. (AR. 73). Dr. Wiseman testified that, beyond December 2006, the record did not show much of any limitation on Plaintiff's ability to stand and walk in an eight-hour workday. (AR 74). Dr. Wiseman further testified that the measurements of Plaintiff's FEV[13] and FVC[14] were "pretty good." (AR 74).

---

[13] FEV stands for forced expiratory volume and refers to the maximum amount of air that can be exhaled in a period of time. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=20404 (last visited Dec. 3, 2010).

[14] FVC stands for forced vital capacity and measures the patients' vital capacity when the patient is exhaling with maximum speed and effort. TheFreeDictionary: Medical Dictionary, http://medical-dictionary.thefreedictionary.com/forced+vital+capacity (last visited Dec. 3, 2010).

Plaintiff testified during both hearings. (AR 27, 65). During the second hearing, Plaintiff testified that she elevated her legs between three to five hours a day. (AR 53). The vocational expert who testified during the second hearing, Ms. Kaner, stated that there are no sedentary jobs available for someone who has to keep their legs elevated at heart level during prolonged periods of sitting. (AR 61).

## V.    ALJ's Decision

On June 4, 2009, in his second decision on the matter, the ALJ denied Plaintiff's claim for disability insurance benefits by following the requisite five-step sequential evaluation process for determining whether an applicant is disabled under the Social Security Act. See 20 CFR §§ 404.1520 and 416.920. (AR 13-26).

At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 1, 2005. (AR 19). At step two, the ALJ concluded that Plaintiff had the following severe impairments: chronic obstructive pulmonary disease and ischemic heart disease. (AR 19). At step three, however, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed impairments set forth in Appendix 1 of the Regulations, 20 CFR Part 404, Subpart P, Appendix 1. (AR 19). At step four, the ALJ found that Plaintiff has the residual functional capacity to perform the requirements of her past relevant work. (AR 19). Upon consideration of Plaintiff's residual functional capacity, age, education, and work experience, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 25). Accordingly, the ALJ concluded that Plaintiff is not disabled under the Act. (AR 26).

## VI.    STANDARD OF REVIEW

To qualify for disability insurance benefits, an applicant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 1382c (a)(3)(A). The applicant must also show that he has a physical or mental impairment of such severity that the applicant is not only

- 10 -

unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). To determine whether an applicant is eligible for disability insurance benefits, the ALJ must conduct the following five-step sequential analysis:

> (1) determine whether the applicant is currently employed in substantial gainful activity;
> (2) determine whether the applicant has a medically severe impairment or combination of impairments;
> (3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;
> (4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;
> (5) if not, determine whether the applicant is able to perform other work that exists in substantial numbers in the national economy.

20 CFR §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).

The Court must affirm an ALJ's findings of fact if they are supported by substantial evidence and free from reversible legal error. See 42 U.S.C. 405(g); see also Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005). Substantial evidence means "more than a mere scintilla," but less than a preponderance, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See, e.g., Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

In determining whether substantial evidence supports a decision, the record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); see also Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). Nonetheless, "[i]t is for the ALJ, not the courts, to resolve ambiguities and conflicts in the medical testimony and evidence." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations and internal quotation marks omitted). The ALJ may draw inferences logically flowing from the evidence, and "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's

- 11 -

1 conclusion which must be upheld." Id. (citation omitted). Regardless, "[i]f the evidence can 2 support either affirming or reversing the ALJ's conclusion, [then the Court] may not 3 substitute [its] judgment for that of the ALJ." Robbins v. Comm'r., Soc. Sec. Admin., 466 4 F.3d 880, 882 (9th Cir. 2006).

5 **IV.    DISCUSSION**

6 Plaintiff argues that the ALJ erred by (1) rejecting the medical opinions of two 7 treating physicians, Drs. Orr and Bria, without providing an adequate explanation, (2) failing 8 to have Dr. Wiseman review the results of the treadmill test before the second hearing, (3) 9 failing to address Plaintiff's testimony that she needed to keep her legs elevated during 10 prolonged periods of sitting, (4) misinterpreting the medical opinions of Drs. Patel and 11 Sandoval, (5) and failing to address Plaintiff's DLCO report in his decision. Plaintiff argues 12 that these errors warrant reversal and an immediate award of benefits. (Doc. 13).This Court, 13 however, finds that the ALJ's decision is supported by substantial evidence of record and is 14 free of legal error. Accordingly, the decision of the ALJ is affirmed.

15 **A.    The ALJ Provided Specific and Legitimate Reasons Supported By**
16 **Substantial Evidence in the Record for Assigning Less Weight to the Opinions**
17 **of Drs. Orr and Bria**

18 An "ALJ may only reject a treating or examining physician's uncontradicted medical 19 opinion based on clear and convincing reasons. Where such an opinion is contradicted, 20 however, it may be rejected for specific and legitimate reasons that are supported by 21 substantial evidence in the record." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 22 1164 (9th Cir. 2008) (citation and punctuation omitted).

23 Plaintiff argues that the ALJ erred by rejecting the medical opinions of treating 24 physicians, Drs. Orr and Bria, without providing specific and legitimate reasons supported 25 by substantial evidence of record. (Pl. Br. 5). Defendant contends that contrary to plaintiff's 26 argument, the ALJ did provide specific and legitimate reasons supported by substantial 27 evidence of record for assigning less weight to the opinions of Drs. Orr and Bria. (Def. Br. 28 18). The Record supports Defendant's position.

The ALJ provided several reasons in his second decision for assigning less weight to the opinions of Drs. Orr and Bria. First, the ALJ found that the opinions of Drs. Bria and Orr were inconsistent with the findings of Drs. Pierrend, Sandoval, Sellberg, Mizraei, and Wiseman. (AR 20-25). In June 2005, Dr. Pierrend found Plaintiff had clear lungs as well as a regular heart rate and rhythm. (AR 290). Dr. Pierrend also found that Plaintiff had no clubbing, cyanosis, or edema in any of her extremities. (AR 289-91). In January and February 2007, Dr. Pierrend again found that Plaintiff had a regular heart rate and rhythm (AR 284-88, 464-68, 527-31). In August 2005, Dr. Sandoval found that Plaintiff had relatively clear, though diminished, lungs and that Plaintiff had a regular heart rate and rhythm and no peripheral edema. (AR 266-68). Dr. Sandoval further found that Plaintiff had no signs of coronary artery insufficiency. (AR 268). He stated that he "did not feel there was any objective information that made [Plaintiff] medically disabled, at least from a cardiac standpoint." (AR 268). In November 2006, Dr. Sellberg found that Plaintiff had clear lungs, a normal heart rate and rhythm, and no extremity clubbing, cyanosis, or edema. (AR 310). From February 2007 through August 2007, Dr. Sellberg consistently found Plaintiff had clear lungs, normal heart rate and rhythm, and only 1+ edema in her lower extremities bilaterally. (AR 301, 439, 446, 537, 544, 615). Dr. Sellberg's findings were consistent with the opinion of Dr. Patel, who in December 2006, described Plaintiff's cardiac condition as stable. (AR 501).

In addition to finding that the opinions of Drs. Orr and Bria were inconsistent with the opinions of the other physicians, the ALJ also found that Drs. Orr and Bria based their opinions, in large part, on Plaintiff's subjective complaints. An ALJ may properly assign less weight to a treating physician's medical opinion where it was based on the claimant's subjective characterization of her symptoms where the ALJ has reason to doubt the credibility of the claimant's assertions. See Bray v. Astrue, 554 F.3d 1219, 1228 (9th Cir. 2009). Here, the ALJ questioned Plaintiff's credibility because Plaintiff had denied using illicit drugs, yet she tested positive for amphetamines, cocaine, and opiates as late as August, 2008. (AR 525). The evidence also showed that Plaintiff continued to smoke a pack of

1   cigarettes a day despite having chronic obstructive lung disease. (AR 20). The ALJ noted
2   that Plaintiff had remodeled and restored her mother's house despite her claims that she was
3   unable to perform any light, unskilled work. (AR20). See Smolen v. Chater, 80 F.3d 1273,
4   1281 (9th Cir. 1996) (holding that the ALJ may consider ordinary credibility techniques,
5   unexplained or inadequately explained failure to follow treatment, and daily activities).

6         The ALJ also stated that he assigned less weight to the opinion of Dr. Orr because Dr.
7   Orr's opinion was inconsistent with his own medical findings. (AR 22). For example, on
8   February 5, 2008, Dr. Orr found Plaintiff had only "occasional" scattered rhonci, a regular
9   heart rate and rhythm, and no extremity swelling. (AR 382-84, 585-87). In July 2008, Dr.
10  Orr found Plaintiff had clear lungs bilaterally, a regular heart rate and rhythm, and no
11  extremity swelling. (AR 380-81, 583-84). The six-minute walk test administered by Dr. Orr
12  showed that Plaintiff could walk 1,200 feet without stopping. (AR 379, 582).

13        In short, the ALJ's decision provided numerous reasons for assigning less weight to
14  the opinions of Drs. Orr and Bria. Objective medical tests, clinical signs, as well as the
15  conflicting opinions of the other physicians, all provided legitimate reasons for the ALJ to
16  assign less weight to the opinions of Drs. Orr and Bria. Accordingly, this Court finds no
17  error.

18        **B. The ALJ Properly Considered the Results of the Treadmill Test**

19        Plaintiff contends that although the ALJ reviewed the results of the treadmill test that
20  Plaintiff completed in December 2008, it was unclear whether Dr. Wiseman (the medical
21  expert who testified at the second hearing) reviewed the results of the treadmill test. (Pl. Br.
22  7-8). Plaintiff claims that Dr. Wiseman's opinion might have changed because according to
23  Dr. Jensen, the results of the treadmill test were "consistent with an intermediate risk of
24  adverse coronary event during the next one to two years." (AR 609).

25        The results of the treadmill test were not made part of the administrative record until
26  after the second hearing. (Def.. Br. 23, AR 65). It therefore appears from the record that Dr.
27  Wiseman was not provided the results of the treadmill test before testifying at the second
28  hearing. The results, however, were provided to the ALJ six months before he issued his

- 14 -

second decision. (AR 13). The ALJ stated in his second decision that he considered all of the evidence, including the treadmill test. (AR 21). Specifically, the ALJ stated that:

> "[a] nuclear treadmill test conducted in December 2008 had the following results: normal ST segment response to treadmill exercise; no exercise induced chest pain reported, exercise dyspnea present; focal, somewhat reversible, mild to moderate basal inferolateral perfusion defect, suspicious for a small infarct with some residual ischemia in the distribution of the right coronary artery, and a left ventricular ejection fraction of 79% with mild basal inferior hypokinesia. The test results were consistent with an intermediate risk of adverse coronary event during the next one to two years."

(AR 21).

This Court, in determining whether substantial evidence supports a decision, must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. Richardson, 402 U.S. at 401. Ultimately, "[i]t is for the ALJ, not the courts, to resolve ambiguities and conflicts in the medical testimony and evidence." Andrews, 53 F.3d at 1039. Here, the ALJ stated that he considered all of the evidence, including the results of the treadmill test. After weighing all of the evidence, the ALJ found that Plaintiff was capable of performing light, sedentary work. (AR 19). This Court finds that there is substantial evidence of record to support the ALJ's conclusion. Accordingly, even though Dr. Wiseman did not review the results of the treadmill test, this Court finds no error.

**C. The ALJ Properly Considered Plaintiff's Testimony That She Needed to Keep Her Legs Elevated During Prolonged Periods of Sitting**

Plaintiff next argues that the ALJ failed to discuss a key piece of Plaintiff's testimony; that she needs to keep her legs elevated during prolonged periods of sitting to prevent swelling in her legs caused by deep vein thrombosis. (AR 53). Specifically, Plaintiff stated that she elevated her legs between three to five hours a day. (AR 53). During both hearings, a vocational expert stated that there are no sedentary jobs available for someone who has to keep their legs elevated at heart level during prolonged periods of sitting. (AR 61, 96). Plaintiff argues that the ALJ should have specifically discussed Plaintiff's testimony and/or the vocational expert's testimony in his decision.

- 15 -

1    While the ALJ did not specifically address Plaintiff's testimony in his decision, he stated that he considered "all of the evidence" and the "entire record" in making his decision. (AR 17). In addition, the ALJ provided several reasons in his decision why he questioned Plaintiff's testimony. The ALJ stated that Plaintiff originally claimed that she had never used illicit drugs, yet she tested positive for cocaine, methamphetamine, and opiates. (AR 20). The ALJ also referred to Plaintiff's testimony given during the first hearing that a cactus thorn got stuck in her leg while she was hiking in 2007. (AR 20). The ALJ noted that Plaintiff should not be able to hike given her conditions. (AR 21). Plaintiff stated that her reference to going hiking had to do with her walking thirty feet to her patio. (AR 20). The ALJ also questioned Plaintiff's credibility because she did not comply with her doctor's recommendations to quit smoking cigarettes. (AR 20).

This Court finds no error because the ALJ is permitted to question whether Plaintiff actually needs to keep her legs elevated as she claims she does. Furthermore, the ALJ stated that he considered all of the evidence, and there is substantial evidence of record to support the ALJ's decision. Accordingly, this Court finds that the ALJ was not required to specifically discuss Plaintiff's testimony in his decision.

**D. The ALJ Did Not Misinterpret the Opinions of Drs. Patel and Sandoval**

Plaintiff next argues that the ALJ misinterpreted the medical opinions of Drs. Patel and Sandoval that Plaintiff was "stable" from a cardiac standpoint. (Pl. Br. 8, AR 501). Plaintiff argues that "[t]he term stable only refers to the capacity to change with regard to a particular condition not the patient's physical capacity." (Pl. Br. 8). Plaintiff further argues that neither doctor provided Plaintiff's actual physical capacity, and neither doctor indicated that Plaintiff was not medically disabled. (Id.).

The record, however, does not support Plaintiff's claim. For example, Dr. Sandoval stated in August 2005 that he "did not feel there was any objective information that made [Plaintiff] medically disabled, at least from a cardiac standpoint." (AR 268). Furthermore, Dr. Sandoval diagnosed Plaintiff's cardiac condition as "[r]egular with a normal S1 and S2. No appreciable murmurs, gallops, rubs or clicks." (AR 267). Plaintiff has not satisfactorily

1  explained why Dr. Sandoval's objective medical findings were inconsistent with a finding
2  that Plaintiff was not disabled from a cardiac standpoint. (AR 267).

3  Dr. Patel's report, issued in December 2006, states that he consulted with Plaintiff and
4  that he believes Plaintiff is stable from a cardiac standpoint. (AR 501). He further stated that
5  Plaintiff denies any heaviness in the chest or shortness of breath. (AR 501). Dr. Patel's
6  report does not explain what the term stable means, but it appears from his report that he
7  found Plaintiff was not in immediate danger and that Plaintiff's condition was improving.
8  (AR 501). Accordingly, even assuming that Plaintiff's interpretation of the term stable is
9  correct, this Court finds no error.

### E. The ALJ Was Not Required to Discuss Plaintiff's DLCO Report

11  Plaintiff next contends that the ALJ should have discussed in his decision that Plaintiff
12  was diagnosed with a DLCO of 52% because the medical expert at the hearing indicated that
13  an accurate, substantiated DLCO of 52% "might" change his overall opinion of Plaintiff's
14  medical condition. (AR 9, 78). It appears from the record that Plaintiff's DLCO report was
15  not officially entered into the administrative record until December 15, 2009—after the
16  second hearing. (AR 9). The medical expert was therefore unable to view the DLCO report
17  when issuing his opinion to the ALJ. However, Plaintiff's counsel asked the medical expert
18  hypothetically if his opinion of Plaintiff's medical condition would change if Plaintiff had
19  a DLCO of 52%. (AR 77). The medical expert testified that his opinion "might" change but
20  that Plaintiff's results would first have to be substantiated, and that even if substantiated, a
21  DLCO of 52%, without more, would not be sufficient to provide an opinion. (AR 77).

22  After the ALJ issued his second decision, Plaintiff argued to the Appeals Council that
23  the ALJ should have addressed Plaintiff's DLCO report in his decision. The Appeals
24  Council stated that it specifically reviewed the DLCO report and found that it was "not
25  material." (AR 2). In addition, the Appeals Council stated that Social Security Regulations
26  require that the DLCO value used for adjudication must represent the mean of at least two
27  acceptable measurements, and that in this case, only one acceptable measurement was taken.
28  (AR 2). Furthermore, according to the medical expert who testified at the second hearing,

1  a person with a substantiated DLCO of 50% or higher would not be able to perform a
2  treadmill test in which they got their heart rate up to 139, yet Plaintiff was able to do so. (AR
3  2, 79).
4        While Plaintiff's DLCO report may have been significant, the ALJ was not required
5  to discuss the DLCO report in his decision because Social Security Regulations require that
6  two acceptable measurements be taken, and only one acceptable measurement was taken.
7  20 C.F.R. pt. 404, subpt. P, app. 1 § 3.00(F)(1).  In addition, there was substantial evidence
8  of record to support the ALJ's decision.  Accordingly, this Court finds no error.

## VII. Conclusion

      This Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence of record for assigning less weight to the opinions of Drs. Orr and Bria. The ALJ made the necessary credibility determinations and provided specific and legitimate reasons that are supported by substantial evidence in the record. In addition, this Court finds that the ALJ did not misinterpret the opinions of Drs. Patel and Sandoval. Furthermore, this Court finds that the ALJ considered all evidence of record, including the results of the treadmill test, the results of the pulmonary function test indicating that Plaintiff had a DLCO of 52%, and Plaintiff's testimony that she needed to keep her legs elevated during prolonged periods of sitting. Based on its review of the record, this Court finds that the ALJ's decision is supported by substantial evidence.

      **Accordingly,**

      **IT IS HEREBY ORDERED** dismissing Plaintiff's Complaint. (Doc. 1)

      **IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment accordingly.

      DATED this 31st day of March, 2011.

_____
Mary H. Murguia
United States District Judge